CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
12/21/2017

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JASON BRADLEY, NAYNA TAYLOR, AND EDWARD TAYLOR,<br><br>*Defendants.* | CASE NO. 3:16-cr-50008<br>DEFENDANTS 1, 6, and 7<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

After a three-week trial, the jury found Jason Bradley, Nayna Taylor, and Edward Taylor guilty of conspiracy to distribute controlled substances and controlled substance analogues (namely, the synthetic drugs MDPV and a-PVP).[1]  The jury also found Bradley guilty of conspiracies to import drugs and to launder money.  In post-trial motions, these Defendants asked the Court to acquit them, to grant them a new trial, and to declare the Federal Analogue Act unconstitutional.[2]  Defendant Bradley also asked for access to the court reporter's personal audio recording of the trial.  At a hearing on these motions, the Court denied each and affirmed Defendants' guilt.  This opinion explains that order.

## I.     MOTIONS FOR ACQUITTAL

Courts are required to sustain the jury's verdict "if, viewing the evidence in the light most favorable to the government, substantial evidence supports it."  *United States v. Kiza*, 855 F.3d 596, 601 (4th Cir. 2017).  "Substantial evidence is evidence that a reasonable finder of fact could

---

[1]     MDPV is a common abbreviation for 3,4-methylenedioxypyrovalerone, and a-PVP is an abbreviation for a-pyrrolidinovalerophenone.  This opinion uses these abbreviations.

[2]     Other defendants pled guilty before trial, but when this opinion uses "Defendants" it is referencing the defendants who went to trial: Jason Bradley, Nayna Taylor, and Edward Taylor.
        Additionally, motions by both parties addressed the forfeiture of various assets associated with the case.  The Court asked for further briefing and will issue an order addressing restitution once that briefing has concluded.

accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014) (internal quotation marks omitted). Inversely, Fed. R. Crim. P. 29 requires a court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In evaluating the sufficiency of the evidence, the "Court must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Cameron*, 573 F.3d 179, 183 (4th Cir. 2009) (internal quotation marks omitted). Here Defendants moved for acquittal. Because the Government presented ample evidence to sustain the verdict, the Court denied Defendants' motions. The following sections describe the evidence that supports the jury's verdict and then address Defendants' other specific objections.[3]

## A. Summary of evidence supporting the verdict

Jason Bradley and his wife Deborah Ryba moved to Chicago in 2009, where they made a living by selling electronic cigarettes they bought from China. (Dkt. 570 at 17). In late 2010 they decided to cut out the middle man and move to China to buy their own electronic cigarette factory. (*Id.* at 27-34). They stayed in China over a year, but never were able to find a factory for the right price. (*Id.*). While they were still in China in early 2011, one of Ryba's cousins reached out to them. This cousin, David Scholz, had heard about synthetic drugs called "bath salts," and he wanted Ryba and Bradley to import these drugs into the United States so that he

---

[3]     In their motions for acquittal, Defendants alleged different types of errors: insufficient evidence, an as-applied constitutional challenge to the Federal Analogue Act, and evidentiary errors at trial. But "[t]here is only one ground for a motion for a judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction[.]'" 2A Wright & Miller, FED. PRAC. & PROC. CRIM. § 466 (4th ed.); *see also United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005) ("The sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction."). So Defendants' arguments that do not address the sufficiency of the evidence are addressed separately below.

could resell them. (Dkt. 570 at 34-37). Ryba and Bradley agreed to buy the drugs Scholz requested. (*Id.* at 39). One of these drugs was MDPV. This drug, according to the government's experts, is substantially similar to other controlled substances (like ecstasy) that are scheduled by the federal government. (Dkt. 508-60 at ECF 9-27; dkt. 561 at 33). Bradley investigated the drug's legality and tried the drug himself. (Dkt. 572 at 25-27; dkt. 573 at 80).

In spite of their knowledge about the drugs, Ryba and Bradley got to work. Ryba contacted a Chinese translator and negotiated MDPV pricing with factories. (Dkt. 570 at 38; dkt. 474 at 25-30). Bradley acquired samples and sent them back to Scholz. (Dkt. 570 at 44). Scholz approved of the samples, and Bradley began sending MDPV back to Scholz in larger quantities. (*Id.* at 22, 51; dkt. 573 at 28-29). The first order, containing a kilogram of MDPV, arrived in the United States in June 2011. (Dkt. 573 at 41-42). A second order arrived three months later. (*Id.*). A third order containing four kilograms of MDPV followed in late 2011. (*Id.* at 49-52). Bradley would open up rice cookers and other consumer goods, put the drugs inside of them, and then reseal the goods in an attempt to avoid law enforcement. (Dkt. 570 at 51-52; dkt. 474 at 31). Bradley would ship the goods through Hong Kong because he believed the United States scrutinized these shipments less than packages arriving directly from China. (Dkt. 570 at 51-52). In return, Scholz wired Bradley money for the drugs. (Dkt. 573 at 28-29).

Back in the United States, Scholz joined with Robert Schroeder and Ryan Buchanan to distribute MDPV to smoke shops and other retailers. (Dkt. 532 at 35-36). Schroeder and Buchanan had prior experience selling MDPV. (Dkt. 573 at 18-22). Scholz, Schroeder, and Buchanan incorporated their enterprise as "Modern Day Prophets" in June 2011 and then hired Nick Purintun and Brian Lister as salesmen. (Dkt. 532 at 36). Together, these five individuals worked to sell MDPV throughout the United States. MDPV was sold in unique packages as

3

"Crystal Bubbly Hookah Cleaner," a recognizable brand created by Ryba and Bradley.  (Dkt. 533 at 21-22; dkt. 572 at 31-33; dkt. 573 at 51-52).  The salesmen phoned smoke shops throughout the country and discretely asked whether they carried "party powder" or "hookah cleaner."  (Dkt. 533 at 30-31).  If the stores responded positively, Modern Day Prophets would send samples and look to build a relationship.  (*Id.*).  The salesmen would tell these retailers what traditional drugs the synthetic drugs mimicked and how to ingest the drugs.  (*Id.* at 34, 44).  These smoke shops passed that information on to their end users.  (*Id.*).

But even as the enterprise took off, legal issues loomed large.  In July 2011, Bradley sent Ryba an email about a DEA bust of a bath salts ring that was selling MDPV.  (Dkt. 570 at 61; dkt. 507-14).  At this point Bradley had been sending shipments of MDPV to Scholz for two months.  (Dkt. 570 at 63).  The article noted how MDPV was designed to mimic the illegal drug ecstasy.  (Dkt. 507-14).  Ryba forwarded the article to Scholz because she was worried that he would get arrested too.  (Dkt. 570 at 65-67).  Bradley also knew that customs officers had stopped some of their packages.  (Dkt. 533 at 69).  Scholz and others were all using "burner" phones and treating the enterprise like an illegal drug dealing business.  (Dkt. 573 at 67).  When four kilograms of MDPV arrived in late 2011, the group attempted to get it to customers quickly because they believed that MDPV was or would soon become illegal.  (*Id.*).[4]

Still, the flow of drugs back to the United States only increased.  Bradley started investigating a different drug, a-PVP, in January of 2012.  (Dkt. 508-4).  This drug, again according to the Government's experts, is substantially similar to MDPV.  (Dkt. 508-60 at ECF 9-27; dkt. 561 at 33).  In February 2012, the co-conspirators purchased twelve kilograms of a-PVP in one order and seventeen kilograms in another.  (Dkt. 508-20; dkt. 572 at 24-25, 37-38;

---

[4]    MDPV became a Scheduled I controlled substance on October 21, 2011.  76 F.R. 65371.

dkt. 573 at 70-74).  A fifty kilogram order came in March.  (Dkt. 531 at 28; dkt. 572 at 36).  And another order for twenty kilograms of a-PVP followed.  (Dkt. 531 at 31; dkt. 573 at 81-83; dkt. 574 at 29-30).  Ryba and Bradley exchanged emails during this time period acknowledging that the police were prosecuting individuals for distributing bath salts.  Bradley and Ryba changed their shipping practices to avoid arrest.  (Dkt. 507-24; dkt. 474 at 43; dkt. 572 at 9).  Bradley timed shipments so that they would go through customs on the weekends, when he believed customs would be staffed leanly.  (Dkt. 572 at 24-25).  Bradley and Ryba continued putting the drugs inside purses and rice cookers.  (Dkt. 570 at 95-103).  Bradley also instructed Scholz to lie to his bank to disguise wire transfers.  (Dkt. 573 at 57-58).  Bradley and Scholz addressed packages to fake names and companies to protect themselves.  (Dkt. 570 at 89).

Bradley and Ryba returned to the United States in June 2012.  (Dkt. 570 at 114; dkt. 572 at 27).  But selling a-PVP had become too lucrative to stop altogether, and so Scholz and two other co-conspirators met with Bradley in June and July of 2012 to plan a trip to China.  (Dkt. 572 at 45; dkt. 574 at 38-39).  Scholz and Schroeder later visited Bradley's apartment where they gave him $30,000 in cash.  (Dkt. 532 at 17-21; dkt. 574 at 40).  Bradley instructed Ryba to get updated pricing on the drugs.  (Dkt. 572 at 45; dkt. 574 at 50-51, 88).  Scholz traveled to China in July 2012.  (Dkt. 570 at 115; dkt. 574 at 45).  During this time period, Bradley and Ryba were worried that Scholz would get caught by the DEA.  (Dkt. 474 at 48-49).  They circulated articles where individuals were being arrested for trafficking bath salts.  (Dkt. 507-27; dkt. 570 at 119-121).  They became aware of DEA raids on smoke shops in June 2012.  (Dkt. 574 at 34-35).

But business was booming through the first half of 2012.  One of the salesmen, Brian Lister, was selling hundreds of packets a week during April, May, and June of 2012.  (Dkt. 533 at 45).  In June 2012, some of the Modern Day Prophet co-conspirators reorganized under the

name "Platinum Prophet" and moved to Atlanta. (*Id.* at 55-60; dkt. 474 at 49). One customer in Atlanta made three purchases for a combined $150,000. (Dkt. 533 at 55). Another, Chris Kaestner in Harrisonburg was buying a-PVP in bulk throughout this period. (Dkt. 573 at 61-64). One substantial client was Queen City Smokes and Novelties in Charlotte. This smoke shop was owned by Nayna Taylor. (Dkt. 533 at 44-53). Brian Lister, the salesman, talked to her on the phone between fifteen and twenty times. (*Id.* at 72). Between one and two thousand of the packets of Crystal Bubbly Hookah Cleaner went to her store. (*Id.* at 46-48). One order in May 2012 was for 100 packets of a-PVP. (Dkt. 508-44 at 2; dkt. 574 at 25-26). She had another order in June 2012 and traveled to Atlanta three or four times to purchase a-PVP, at least twice by helicopter. (Dkt. 574 at 26, 47, 52). Scholz and Schroeder returned to Chicago and repaid Bradley from the money they had earned in Atlanta. (*Id.* at 58).

Business slowed after the conspirators returned from Atlanta. They no longer had a-PVP to sell. (Dkt. 531 at 42). Schroeder tried to find other suppliers without luck. (Dkt. 574 at 61-62). While they struggled to import more a-PVP, the massive amount of a-PVP that they had pushed out to their distributors (like Nayna Taylor in Charlotte) was being sold to end users throughout 2013. The DEA organized a controlled buy at Queen City Smokes and Novelties in Charlotte because they suspected it was selling a-PVP. (Dkt. 534 at 7-8). During the ensuing search, the DEA found Crystal Bubbly Hookah Cleaner packets for sale in the store. (*Id.* at 35).

Schroeder and Scholz reinitiated contact with Bradley in 2014. (Dkt. 534 at 63-64; dkt. 570 at 126-128). They set up a meeting to talk about acquiring more a-PVP in August or September of 2014.[5] (Dkt. 574 at 66). Schroeder, Scholz, and Bradley researched the law together and decided to move forward in October. (Dkt. 474 at 55-56; dkt. 532 at 22-28; dkt.

---

[5]    Significantly, a-PVP had been put on Schedule I on March 7, 2014. 79 F.R. 12938.

574 at 80-84). Bradley and Ryba returned to Asia to buy a-PVP in November 2014. (Dkt. 570 at 129-130). One package was stopped in customs, but Schroeder and Scholz received two kilograms of a-PVP from Bradley. (Dkt. 532 at 29-30; dkt. 570 at 137; dkt. 574 at 90). Schroeder and Scholz distributed this a-PVP to Nayna and Edward Taylor in Charlotte, Chris Kaestner in Harrisonburg, and others. (Dkt. 574 at 94). The smoke shops then resold this a-PVP. In June 2015, an informant contacted Nayna Taylor to buy 200 packets of a-PVP. (Dkt. 535 at 7). Nayna and Edward Taylor arrived at the controlled buy and sold the a-PVP packets to the informant. (*Id.* at 15-20). The Taylors were then arrested again. (*Id.*). Shortly thereafter, law enforcement arrested all of the other co-conspirators. (Dkt. 510 at 143). The conspiracy was over.

**B.  Analysis of the sufficiency of the evidence**

Despite this mass of evidence, Defendants argued generally that the evidence was insufficient for the jury to convict them. Defendants also argued more specifically that there was insufficient evidence: (1) that they agreed to form a conspiracy to distribute controlled substances, (2) that they knew they were distributing controlled substances, and (3) that they had committed a crime in the Western District of Virginia. I take each argument in turn, but find that the jury's verdict is amply supported by the evidence. After reviewing the evidence and the crimes charged, I also reject Defendants' more general argument for acquittal.

### 1.  Evidence establishing Defendants conspired to distribute controlled substances

Defendants challenged whether there was sufficient evidence for the jury to find that they conspired to distribute controlled substances under the Controlled Substances Act and the Controlled Substances Analogue Enforcement Act (the Analogue Act). Under either act, the Government must establish beyond a reasonable doubt that: "(1) an agreement to distribute and

possess [the controlled substance or controlled substance analogue] with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *United States v. Yearwood*, 518 F.3d 220, 225-26 (4th Cir. 2008) (internal quotation marks omitted).   When proving the first element under the Analogue Act, the Government must additionally prove that the relevant substance is a controlled substance analogue.[6]   Under the second element, knowledge of the conspiracy requires the Defendants' knowledge that they were dealing with "controlled substances."   *See McFadden v. United States*, 135 S. Ct. 2298, 2302 (2015). Evidence establishing this knowledge is reviewed in the next section.   This section focuses on the first and third elements—whether a conspiracy existed and whether Defendants entered into that conspiracy.

Direct evidence of conspiracies is rare; the elements are usually proven by circumstantial evidence.   *Yearwood*, 518 F.3d at 26.   "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy."   *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (internal quotation marks and alterations omitted).   A defendant's intent to form a conspiracy can be inferred from "the regularity and volume of dealings" even if that defendant engages in "similar large scale distribution functions

---

[6]      A controlled substance analogue is "any substance 'the chemical structure of which is substantially similar to [that] of a controlled substance in schedule I or II' (the chemical structure element), and 'which has [an actual, claimed, or intended] stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II' (the physiological effect element)."   *United States v. McFadden*, 823 F.3d 217, 220 (4th Cir. 2016) (alterations in the original), *cert. denied*, 137 S. Ct. 1434 (2017).   Additionally, to be treated as a scheduled controlled substance, the controlled substance analogue must be "intended for human consumption."   21 U.S.C. § 813.

in separate localities without specific knowledge of the existence or numbers of such other persons and localities." *United States v. Burman*, 584 F.2d 1354, 1356–57 (4th Cir. 1978).

The Government presented ample evidence that Bradley conspired to distribute controlled substances and controlled substance analogues.[7]  As recounted above, Bradley repeatedly sent MDPV into the United States with the knowledge that Scholz and others would redistribute it to end users.  The shipments of MDPV occurred in 2011, both before and after MDPV was scheduled.  (Dkt. 570 at 66; dkt. 572 at 21; dkt. 573 at 67).  In 2012, Bradley also worked with his co-conspirators to import a-PVP with the understanding that they would resell it to their customers, and that he would be paid.  Bradley specifically objects that there was insufficient evidence that he was involved in the conspiracy's operations in late 2014.  But Bradley met with co-conspirators Schroeder and Scholz to discuss obtaining controlled substances from China in this period.  (Dkt. 532 at 22-28; dkt. 534 at 63-64; dkt. 574 at 55-56, 80-84).  The Government presented evidence that Bradley was paid by the co-conspirators for his help in connecting them with translators and producers in China.  (Dkt. 570 at 129-130).

More generally, conspiracy is a "continuing offense" and "a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."

---

[7]      I note as a preliminary matter that there was sufficient evidence for the jury to find that MDPV and a-PVP were controlled substance analogues.  Dr. Van Linn's and Dr. Prioleau's expert testimony on the chemical structure elements and the physiological elements of MDPV and a-PVP provided ample evidence for the jury to find that those two drugs were controlled substance analogues.  (Dkt. 561; dkt. 508-60 at ECF 9-27).

There was also sufficient evidence Defendants intended the substances for human consumption.  Bradley testified he drew the assumption that people were consuming the drugs in 2010 and 2011.  (Dkt. 572 at 10, 28). He emailed multiple articles to his wife that refer to human consumption of bath salts.  (Dkts. 474 at 43-47; dkt. 572 at 9-13).  The Taylors' sales through their store and discussions with the undercover informant also provided sufficient evidence for the jury to infer the Taylors intended the drugs for consumption.  (Gov't Exhibit 101, 105).

*Smith v. United States*, 568 U.S. 106, 111 (2013)  (internal citations omitted)).  And Bradley never withdrew from this continuing enterprise.  *See United States v. Urbanik*, 801 F.2d 692, 697 (4th Cir. 1986) ("Withdrawal must be shown by evidence that the former conspirator acted to defeat or disavow the purposes of the conspiracy.").  The Government presented sufficient evidence for the jury to find that Bradley was part of a conspiracy to import and distribute MDPV and a-PVP before and after they were scheduled.

The evidence that the Taylors conspired to distribute a-PVP is also substantial.  Brian Lister testified about the fifteen to twenty conversations about bath salts he had with Nayna Taylor starting in late 2011.  (Dkt. 533 at 72).  Between one and two thousand of the packets went to her store.  (*Id.* at 46-48).  Emails showed orders in May 2012 for 100 packets of a-PVP. (Dkt. 508-44 at 2; dkt. 574 at 25-26).  She had a follow up order in June 2012.  (Dkt. 574 at 26). She traveled to Atlanta three or four times to purchase a-PVP, at least twice by helicopter.  (*Id.* at 47, 52).  In 2013, the DEA set up a controlled buy at Queen City Smokes and Novelties in Charlotte because they suspected that Nayna Taylor was selling bath salts.  (Dkt. 534 at 7-8). After the controlled buy, the DEA tested the products, found that they contained a-PVP, and got search warrants.  (*Id.* at 8).  During the ensuing search, the DEA found more Crystal Bubbly Hookah Cleaner packets.  (*Id.* at 35).  Nayna Taylor, even after this arrest, continued selling a-PVP.  Schroeder sent Nayna Taylor more a-PVP in 2014.  (Dkt. 574 at 94).  The smoke shop continued selling it, and in June 2015 a confidential informant placed a call to Nayna Taylor to buy 200 packets of a-PVP for a biker rally.  (Dkt. 535 at 7).  Edward Taylor confirmed the location of this purchase and the quantity of a-PVP packets to be sold.  (Gov't Exhibit 101). Nayna and Edward Taylor arrived at the controlled buy and exchanged the Crystal Bubbly Hookah Cleaner packets to the informant.  (Dkt. 535 at 15-20).  They were then arrested.  (*Id.*).

This was sufficient evidence for the jury to find that Nayna Taylor trafficked a-PVP both before and after it was scheduled. And this was also sufficient evidence for the jury to find that Edward Taylor trafficked a-PVP after it was scheduled (although not before).[8]

Additionally, there was sufficient evidence for the jury to find that Nayna Taylor conspired to traffic MDPV. Robert Schroeder testified Nayna Taylor bought Crystal Bubbly Hookah Cleaner as early as the end of 2011. (Dkt. 574 at 51). Modern Day Prophet was still selling MDPV in Crystal Bubbly Hookah Cleaner packets at the end of 2011. (Dkt. 573 at 67). While there was insufficient evidence for the jury to find that Edward Taylor conspired to distribute MDPV, his conviction, as stated above, was amply supported the a-PVP conspiracy.

The Taylors separately argue that they were not part of the same conspiracy as their co-defendants and that they had a mere "buyer-seller" relationship with the conspirators. One conspiracy exists when there is "one overall agreement." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988). "Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *Id.*; *United States v. Jones*, 858 F.3d 221, 226 (4th Cir. 2017) ("[W]e look to the degree of overlap not the degree of similarity to determine whether two charges are in reality a single offense."). And the scope of dealings with a co-conspirator can be sufficient to alert a defendant to the scope of a conspiracy beyond their immediate dealings. *United States v. Richards*, 737 F.2d 1307, 1309 (4th Cir. 1984). This

---

[8]    Conspiracy to distribute controlled substances can be committed through conspiracy to distribute either scheduled controlled substances *or* controlled substance analogues. The jury's verdict forms show they convicted all three Defendants of conspiracy to traffic both scheduled controlled substances *and* controlled substance analogues. (Dkts. 499, 500 and 501). However, the Court finds there was only sufficient evidence to convict Edward Taylor of conspiracy to distribute a-PVP after it was scheduled on March 7, 2014 (*i.e.* as a scheduled controlled substance). Put differently, there was insufficient evidence for the jury to find Edward Taylor guilty of conspiracy to distribute controlled substance analogues. Nevertheless, his conviction survives based on the evidence that he conspired to distribute a-PVP after it was scheduled.

principle is considered alongside the "buyer-seller" defense, which is valid when "there was no agreement to participate in the drug distribution operation," and "the defendant's participation was limited to fulfilling and facilitating his or her own personal drug consumption needs." *United States v. Leonard*, 777 F. Supp. 2d 1025, 1034 (W.D. Va. 2011).

Nayna Taylor's repeated purchases of Crystal Bubbly Hookah Cleaner and the Taylors' 2015 sale of a-PVP created sufficient overlap with the general conspiracy. Nayna Taylor repeatedly bought large quantities of Crystal Bubbly Hookah Cleaner and then resold these drugs from her smoke shop. (Dkt. 533 at 44; dkt. 574 at 94). She continued doing this even after her store and home were raided in 2013. (Dkt. 535 at 7). Likewise, Edward Taylor assisted Nayna Taylor with the 2015 sale after the 2013 raid. (Dkt. 534 at 7-9). He drove her to resell Crystal Bubbly Hookah Cleaner to the government informant. (Dkt. 535 at 7). On the way to the sale, Edward Taylor spoke to the informant and confirmed location of the sale and quantity of packets to be sold. (Gov't Exhibit 101). After he had been arrested, he nevertheless invented a story about making the trip to sell glass jewelry cases. (Dkt. 535 at 34). The jury was entitled to infer that Edward Taylor knew what he was doing; this fabrication provided further evidence of his intent to join the conspiracy.

The Taylors were more than mere buyers acquiring Crystal Bubbly Hookah Cleaner for their "own personal drug consumption needs." *Leonard*, 777 F. Supp. 2d at 1034. Instead, they were sophisticated distributors of the drug, evidenced by the detailed records of sales and large amount of money involved. (Dkt. 534 at 18-20 and 25-27). Furthermore, a buyer-seller relationship can still be sufficient to sustain a conspiracy charge when combined with other factors. *See United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008) ("[E]vidence of such a relationship, when combined with evidence of a substantial quantity of drugs—as here—

'would support a reasonable inference that the parties were coconspirators.'"). The overarching conspiracy involving Bradley, Ryba, and Modern Day Prophet required smoke shops to sell the imported drugs to end users. Edward and Nayna Taylor joined this overarching conspiracy by buying and distributing large volumes of drugs.[9]

In summary, the evidence was sufficient to establish that Jason Bradley and Nayna Taylor entered into a conspiracy to distribute both scheduled controlled substances and controlled substance analogues. The evidence was also sufficient to establish that Edward Bradley entered into a conspiracy to distribute scheduled controlled substances. Accordingly, the motions for acquittal on these grounds were denied.

### 2. Evidence of knowledge that a-PVP and MDPV were controlled substances

Defendants argue that there was insufficient evidence for the jury to find that Defendants knew they were dealing with "controlled substances." The requisite mental state for conspiracy to distribute controlled substances and controlled substance analogues was recently addressed in *McFadden v. United States*, 135 S. Ct. 2298 (2015). The Supreme Court held that "the Government must prove that a defendant knew that the substance with which he was dealing was 'a controlled substance,' even in prosecutions involving an analogue." 135 S. Ct. at 2305. This

---

[9]    The Taylors also plead their innocence because one of their conspirators was a federal agent. But an agent does not defeat a conspiracy when the defendant also conspired with others:

> The rule that government agents do not count as co-conspirators has relevance only "in situations where the conspiracy involves only [one] defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire and the government informer is not a true conspirator." . . . In the instant case the plurality requirement is satisfied by the participation of two "true" conspirators . . . . The participation of government agents therefore does not negate the existence of the conspiracy charged.

*United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987); *see also United States v. Edmonds*, 679 F.3d 169, 175 (4th Cir. 2012), *vacated on other grounds*, 568 U.S. 803. There was ample evidence here that the Taylors conspired with Brian Lister, Robert Schroeder, and each other.

"knowledge requirement can be established in two ways." *Id.* "First, it can be established by evidence that a defendant knew that the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance." *Id.* "Second, it can be established by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." *Id.* "Under this second method of proof, knowledge of the substance's chemical structure and physiological effects is sufficient to support a conviction." *United States v. McFadden*, 823 F.3d 217, 223 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017).

Unlike the defendants in *McFadden*, Defendants here were convicted of violations based on both the Controlled Substance Act and the Analogue Act.[10]   The Government presented sufficient evidence that Defendants possessed the requisite knowledge by establishing that each "defendant knew that the substance with which he was dealing [was] some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act . . . ." *McFadden*, 135 S. Ct. at 2305.  On remand in *McFadden*, the Fourth Circuit stated that a "jury could have inferred from McFadden's evasive behavior and the 'disclaimer' labeling of the packages and vials that he knew that the bath salts were treated as controlled substances."  823 F.3d 217, 226 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017).  All three Defendants here engaged in similarly evasive behavior that provided the jury with enough evidence to make the inference that Defendants knew the bath salts were treated as controlled substances.

---

[10]     So even if there had been insufficient evidence to establish *McFadden* knowledge for the controlled substance analogues, Defendants' convictions would still be valid if there was sufficient evidence for the jury to find Defendants had conspired to traffic the scheduled controlled substances.

The evidence of Bradley's knowledge that MDPV and a-PVP were controlled substances is substantial. Bradley engaged in evasive behavior to hide these drugs from law enforcement. Bradley put the drugs in rice cookers and commercial goods before shipping them in an attempt to hide them from customs officials. (Dkt. 474 at 31; dkt. 572 at 23-24; dkt. 573 at 32-33). Bradley sent the packages to fabricated names and businesses to further avoid law enforcement. (Dkt. 474 at 41; dkt. 570 at 89; dkt. 572 at 42; dkt. 573 at 50). He told his co-conspirators to falsify electronic transfers of money to avoid suspicion. (Dkt. 573 at 58). He prevented his co-conspirators from bringing their cell phones near him out of a fear of wiretaps. (Dkt. 574 at 40-41). He required one co-conspirator to only talk to him on a "burner" phone. (*Id.* at 89). He put "not for human consumption" notices on his packaging even though he knew the drugs were being sold for human consumption. (*Id.* at 67). This evasive behavior was enough for others to realize that he was acting illegally. (Dkt. 570 at 105).[11]

Bradley additionally engaged in research about the legality of these substances. (Dkt. 532 at 22; dkt. 572 at 5, 25, 27). He then sent and received emails about this research to his co-conspirators. (Dkt. 474 at 43-49, 53-54; dkt. 570 at 63-65, 104, 131; dkt. 572 at 9, 13). He even testified that he understood the legal problems with a-PVP in June or July 2012—before he helped organize trips to China for co-conspirators to send the substances back to the United States. (Dkt. 572 at 9, 38). And he realized that various shipments of drugs back to the United States had been confiscated. (Dkt. 574 at 102). This evidence of Bradley's evasive behavior and

---

[11] Bradley argues that he was engaging in this evasive behavior for other purposes. But there were competing inferences to be drawn from that evidence, and the jury was entitled to view the evidence as circumstantial proof of knowledge. *See United States v. Castillo–Pena*, 674 F.3d 318, 321 (4th Cir. 2012) ("[I]t is the jury, not the reviewing court, which weighs the credibility of the evidence and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." (quotation marks omitted)).

research was sufficient for a jury to find that he knew he was dealing with a federally controlled substance.[12]  This established the requisite knowledge under *McFadden*'s first method of proof.

The Government also presented sufficient evidence that Bradley had knowledge of the substances' chemical structures and physiological effects under *McFadden*'s second method of proof.  He identified the controlled substances by their chemical names when purchasing them during the length of the conspiracy.  (Dkt. 474 at 26, 50-51, 88; dkt. 570 at 49-50).  He researched these chemicals on the DEA website, which contained information about their chemical structure and physiological effects.  (Dkt. 572 at 25).  He also labeled at least one of the bags of drugs sent to the United States by name.  (Dkt. 532 at 30; dkt. 574 at 93).  He circulated an article that identified MDPV as a bath salt that was similar to other controlled substances.  (Dkt. 474 at 34-37).  Bradley had also ingested MDPV and compared its effects to ecstasy.  (Dkt. 532 at 5; dkt. 573 at 80).  Bradley's familiarity with the chemicals and their effects was sufficient for the jury to infer "knowledge of the substance's chemical structure and physiological effects." *McFadden*, 823 F.3d at 223.

Nayna Taylor's evasive behavior and conversations with an undercover agent similarly demonstrated that she knew she was dealing with a federally controlled substance under *McFadden*'s first method of proof.  During a controlled-buy, she discussed how she had previously been raided for selling a-PVP, but how she continued selling to make money and "survive."  (Gov't Exhibit 105).  Nayna Taylor flew in a helicopter when going to Atlanta to buy bath salts in bulk from her co-conspirators.  (Dkt. 574 at 53-54).  She then sold the drugs to individuals with the warning that they were "not for human consumption," even though she knew clients were ingesting them.  (Dkt. 534 at 46; dkt. 572 at 10).  More generally, Nayna

---

[12]    Bradley's efforts to avoid federal customs officials and research on the DEA website undercut his argument that he thought these drugs were only controlled under state law.

Taylor did not display these drugs on her shelves, but hid them behind the store's counter, and kept separate records of these sales. Along with the evidence summarized above, this evidence was sufficient for the jury to infer that she knew the drugs were federally controlled substances.

Edward Taylor likewise displayed evasive behavior from which the jury could have inferred that he knew he was dealing with a federally controlled substance under *McFadden*'s first method of proof. These drugs had been seized from his home in 2013. (Dkt. 534 at 35). And yet Edward Taylor later participated in a sale of the same drugs to a government informant, confirming the quantity and location of the sale. (Gov't Exhibit 101). Taylor was then taped engaging in a controlled buy with his co-conspirator. (Dkt. 535 at 20-26). When police officers questioned him about the controlled buy, he claimed that he was there to sell a glass jewelry case. (Dkt. 535 at 34). In light of the conversation leading up to the purchase and the videotaped purchase itself, this fabrication provides further evidence for the jury to infer that Edward Taylor knew he was dealing with a controlled substance and was attempting to evade law enforcement.

Defendants' motions for acquittal on this ground therefore fail.[13]

### 3. Evidence establishing venue in the Western District of Virginia

Defendants challenge whether there was sufficient evidence to establish venue in the Western District of Virginia. (Dkt. 527 at 3; dkt. 553 at 11; dkt. 552 at 11). They argue that they did not commit any crime in this district. *See United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012) ("A federal criminal defendant is entitled to be tried in the State and district where the alleged crime was committed."). The Court rejected this and similar arguments at trial, (Dkt. 562 at 7), and denied the motions for acquittal based on them.

---

[13]    Defendants separately argue that there was insufficient evidence that they knew the conspiracy they were joining was unlawful. But this evidence of evasion also allowed the jury to infer that Defendants understood that the conspiracy they were joining was unlawful.

"[V]enue is a question of fact in which the burden of proof rests with the government, but unlike other facts in the government's case, it may be proven by mere preponderance of the evidence." *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012). Defendants' objections to venue each fail because the Fourth Circuit has held "in a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires." *United States v. Bowens*, 224 F.3d 302, 311 n. 4 (4th Cir. 2000); *United States v. Moussaoui*, 591 F.3d 263, 300 (4th Cir. 2010), *as amended* (Feb. 9, 2010). The Government here presented sufficient evidence for a jury to conclude that an overt act in furtherance of the conspiracy occurred in the Western District of Virginia. *See also United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012) (holding that phone calls were acts in furtherance of the conspiracy sufficient to establish venue); *United States v. Smith*, 452 F.3d 323, 335 (4th Cir. 2006) ("Acts in furtherance of a criminal conspiracy include exploits large and small, dealings that represent turning points in the conspiracy and those that merely enable it to continue its operations.").

The jury heard evidence that Robert Schroeder was selling Crystal Bubbly Hookah Cleaner to Chris Kaestner, in Harrisonburg, Virginia, from the end of 2011 through 2015. (Dkt. 573 at 63-65; dkt. 574 at 95-100; dkt. 531 at 43). During late 2011, Schroeder sold MDPV provided by Bradley to Kaestner. (Dkt. 573 at 64-65). The jury was entitled to find that MDPV was a controlled substance analogue until October 21, 2011, and it was a Schedule I controlled substance after that point. During Schroeder's later sales of a-PVP to Kaestner in 2012, 2014 and 2015, the drugs sold to Kaestner had been imported by Scholz and Schroeder with the help of Bradley and Ryba. (Dkt. 532 at 23-30; dkt. 573 at 65). Bradley set up meetings in China for his co-conspirators that sent a-PVP back into the United States. (Dkt. 574 at 64). The jury was

entitled to find that a-PVP was a controlled substance analogue from October 21, 2011 until March 7, 2014, and it was a Schedule I controlled substance after this point.  The sales to Christopher Kaestner were "acts in furtherance of the conspiracy," and so venue was appropriate in the Western District of Virginia for all conspirators. *Moussaoui*, 591 F.3d at 300.

As discussed above, the Government also presented evidence that the Taylors were part of this same conspiracy.  Nayna Taylor ordered Crystal Bubbly Hookah Cleaner from Brian Lister in May 2012. (Dkt. 533 at 53).  In the following years, between one and two thousand of the packets went to her store. (Dkt. 533 at 46-48).  In 2013, police engaged in a controlled buy of Crystal Bubbly Hookah Cleaner from Nayna Taylor. (Dkt. 534 at 7-35).  And Edward and Nayna Taylor sold Crystal Bubbly Hookah Cleaner to a government informant in 2015. (Dkt. 535 at 7-36).  Defendants argue that the drugs seized from Kaestner in 2013 were sold during a "break" in the conspiracy, and so are unconnected to them.  But Nayna Taylor was still selling Crystal Bubbly Hookah Cleaner packets during this same window. (Dkt. 534 at 7-35).  The jury was entitled to make the inference that these packets seized in 2013 were part of the sales made by the conspiracy in the end of 2012.  The Taylors also argue that the later sales from Schroeder to Kaestner, in 2015, are unconnected to them because they were already incarcerated.  But a conspiracy is not terminated merely because its participants are arrested. *See United States v. Urrego-Linares*, 879 F.2d 1234, 1240 (4th Cir. 1989).  The end of the conspiracy must be "affirmatively shown," *Joyner v. United States*, 547 F.2d 1199, 1203 (4th Cir. 1977), and here there was no evidence "the former coconspirator acted to defeat or disavow the purposes of the conspiracy." *United States v. Urbanik*, 801 F.2d 692, 697 (4th Cir. 1986).  Nayna Taylor was part of the conspiracy throughout this period, Edward Taylor was part of the conspiracy by the time of the 2015 sale, and so venue was proper against them in the Western District of Virginia.

19

Finally, the Taylors argue that they could not have foreseen that the conspiracy extended to Virginia, and so any overt act that occurred there should not establish venue against them. (Dkt. 552 at 10-13; dkt. 553 at 11-14). This argument challenges whether the transactions between Schroeder and Lister with Kaestner were attributable to the Taylors. The Fourth Circuit's analysis has not focused on foreseeability, and has instead been willing to attribute an overt act of any co-conspirator to all co-conspirators. *See Bowens*, 224 F.3d at 311 n. 4. But whether a co-conspirator's acts must be foreseeable does not much matter here because it was foreseeable to the Taylors that the conspiracy would sell drugs into Virginia. The Taylors were aware the drugs had been shipped to them from Illinois, and Nayna Taylor had travelled to Atlanta to pick up further deliveries. This experience with a national conspiracy made it reasonably foreseeable that their co-conspirators were operating in their neighboring state of Virginia. The Taylors' co-conspirators engaged in overt acts in the Western District of Virginia, and "because proof of acts by one co-conspirator can be attributed to all members of the conspiracy, [one defendant's] contacts with the [district] serve to establish venue for all the defendants." *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995).

Accordingly, Defendants' motions for acquittal on this point were denied.

## VI. MOTIONS FOR A NEW TRIAL

Because many of Defendants' purported motions for acquittal raised issues beyond the sufficiency of the evidence, these arguments (as well as the motions for a new trial made in the alternative) are addressed as motions for a new trial.[14] "Rule 33 allows a district court to '[u]pon

---

[14] Defendants' motions sought to incorporate all previous objections made before and during trial. Many of these motions necessarily did not involve the sufficiency of the evidence (they were made before the jury's verdict), and so they are considered as Rule 33 motions. But motions for a new trial do not provide an opportunity to relitigate each of the Court's previous decisions. *See United States v. Campa*, 459 F.3d 1121, 1154 (11th Cir. 2006) ("We will not

the defendant's motion, . . . vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) (quoting Fed. R. Crim. P. 33(a)). The Fourth Circuit has cautioned that a court "should exercise its discretion to grant a new trial 'sparingly.'" *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017) (citation omitted). Here Defendants moved for a new trial based on the Court's evidentiary rulings, the Government's presentation and reliance on allegedly false testimony, and the Court's instructions to the jury.[15] Defendants did not demonstrate that the Court or the Government erred, and even if the Court or the Government had erred, Defendants did not demonstrate sufficient prejudice to justify a new trial. So the Court denied the motions.

## A. Verdict against the weight of evidence

A new trial can be granted if the jury's verdict was against the weight of the evidence. When considering a motion for a new trial on this basis, "the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). However, a court should only grant a new trial "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment . . . ." *Id.* Here an extensive record, recounted above, establishes Defendants' guilt, and so Defendants' motions for a new trial were denied. This is not the case "when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir.

---

permit, nor does Rule 33 permit, the defendants to take a second—or fifth—'bite at the apple.'"). The arguments raised in the briefs are addressed, but the Court will not repeat and relitigate each of its previous rulings.

[15]    Defendant Bradley also briefly renewed an objection to the chain of custody of the drug evidence cited by the Court in its original Rule 29 ruling on this issue. (Dkt. 527 at 3) (stating *in toto*: "The Defendant renews his chain of custody objection to the drug evidence cited by the Court in its original Rule 29 ruling and joins in co-Defendants Taylor anticipated Rule 29/Rule 33 Motion on this issue."). He did not elaborate on the arguments that were previously rejected by the Court, so the Court reaffirmed its previous ruling and denied the motion on this grounds.

2003); *see also* 3 Wright & Miller, FED. PRAC. & PROC. CRIM. § 582 (4th ed.) ("The power to grant a new trial on this ground should be invoked only in exceptional cases, where the evidence weighs heavily against the verdict.").

**B.  Failure to admit Defense Exhibit B17 and evidence concerning pyrovalerone**

A new trial may also be granted if the court made an erroneous evidentiary ruling that would require reversal on appeal.  3 Wright & Miller, FED. PRAC. & PROC. CRIM. § 589 (4th ed.) ("Courts have concluded that any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial.").  Defendants argue that the Court erred in refusing to admit Defense Exhibit B17.  This exhibit consisted of an article where the DEA purportedly said that MDPV was similar to pyrovalerone, a Schedule V substance.  (Dkt. 563 at 13-16).  The Court excluded the exhibit because it was not authenticated and it was not relevant.  (*Id.* at 17-18).

First, the Court refused to admit Defendants exhibit because it was not authenticated. "Under [Federal] Rule [of Evidence] 901, 'to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'"  *United States v. Kaixiang Zhu*, 854 F.3d 247, 257 (4th Cir. 2017).  Defendants' exhibit had not been authenticated pre-trial, and Defendants did not produce a certificate or custodial witness.  Defense counsel asked the witness whether she could authenticate the exhibit on the stand.  She could not, and additionally did not know whether it had been posted on the website during the relevant time period.  (Dkt. 563 at 13).  Defendants are bound by that answer and did not carry their burden under Rule 901.

Second, Defendants did not prove the exhibit's relevance.  During a sidebar conversation, Bradley's counsel offered the exhibit on the basis that it demonstrated that MDPV and a-PVP were analogues of a Schedule V substance, pyrovalerone.  (Dkt. 563 at 17).  Defendants'

argument about the document's relevance is similar to their further arguments about other pyrovalerone-related evidence. The Court's rulings on the evidence concerning pyrovalerone were correct because a drug's similarity to a Schedule V substance does not provide relevant information about its similarity to a Schedule I or Schedule II substance. Other courts have agreed on this precise question. *See, e.g., United States v. Lane*, 616 F. App'x 328, 329 (9th Cir. 2015) ("The district court did not abuse its discretion in excluding evidence about pyrovalerone, a Schedule V controlled substance, as irrelevant and confusing. Lane argues that the excluded evidence was relevant on the premise that he could not be found guilty if he could prove that the alleged analogues were closer to pyrovalerone than to methcathinone or MDPV. This premise is not supported by the statutory language or the caselaw."), *cert. denied*, 136 S. Ct. 921 (2016). Furthermore, the Court previously rejected Defendants' request to present evidence about other chemicals through their expert, (dkt. 419 at 9-10), and Defendants have not presented any new arguments on this issue. The Court's refusal to admit this exhibit was correct, and so Defendants' motions were denied.

## C. Relevance of Detective William Scotton's testimony and related evidence

In 2015, Edward and Nayna Taylor were arrested by federal drug enforcement agents. There is video and audio of the interactions leading up to the arrest and the arrest itself. (Gov't Exhibits 101, 105). One of the arresting officers was Detective William Scotton. But at trial Detective Scotton appeared to misidentify Nayna Taylor, instead pointing to her translator. Defendants argue that this misidentification made his testimony about the arrest and the drugs seized irrelevant because there was not evidence that he was actually talking about the Taylors. Defendants raised this issue at trial, and the Court overruled objections to Detective Scotton's testimony because other evidence, namely the video and audio, established the relevancy of

23

Detective Scotton's testimony.  (Dkt. 536 at 7).  While Detective Scotton pointed at the wrong individual in the courtroom, he and Officer Berry both correctly identified Nayna Taylor in the video that was entered into evidence.    (Dkt. 535 at 18-20).  Defendants make the same arguments that were considered and rejected at trial, and the Court rejects them again here.[16]

## D.  Kent's allegedly false testimony

Defendants allege Ms. Kent, a Government witness, "testified falsely, or at least mistakenly," about when the DEA website posted a list of controlled substance analogues.  (Dkt. 558 at 18-19).  Defendants claim "Ms. Kent testified that the DEA has listed the substances in which they deemed to be controlled substance analog[ue]s on the DEA website since 2011." (Dkt. 558 at 18).  But Ms. Kent's testimony was merely equivocal, not false, and it could not have prejudiced Defendants in light of the instructions given to the jury and the overwhelming evidence.  Ms. Kent testified that the Diversion Control Division of the DEA published a list of drugs or chemicals that they believe to be controlled substance analogues, and that they did so in 2010, 2011, and 2012.  (Dkt. 563 at 18).  She separately stated that the DEA website has added the analogues to the statutory Schedule I substances.  (*Id.* at 20).  She equivocated on exactly when this happened, but thought it happened in 2012.  Finally, she was asked "when they started publishing the list of controlled substance analogues[.]"  She responded that there were multiple different lists and schedules, and she was not sure what time frame she was being asked about. The cross-examination concluded without further clarification.  (*Id.*).

---

[16]    Additionally, the Government presented other evidence, apart from the analysis of the drugs from the Detective Scotton raid, that provided sufficient evidence for a jury to find Nayna and Edward Taylor guilty.  (*See* dkt. 533 at 44-53; dkt. 508-44 at 2; dkt. 574 at 25-26; dkt. 534 at 7-8; dkt. 535 at 7-20).  "[M]istaken identifications, however, do not command a judgment of acquittal when, as here, the Government has presented also sufficient evidence which could support a jury finding of guilt beyond a reasonable doubt."  *United States v. Hall*, 396 F. 2d 841, 844 (4th Cir. 1968).

"A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured," and "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). Defendants here have not cleared the threshold of demonstrating that the witness testified falsely, and so their motion for a new trial on this grounds was denied. *See United States v. Andrade*, 232 F. App'x 349, 351 (4th Cir. 2007). Furthermore, even if the testimony about when the DEA published a list of substances that it believed were controlled substance analogues was false, this false testimony would only require a new trial if there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Here, there was no reasonable likelihood that any false testimony would have affected the judgment of the jury because there were instructions about when these substances became scheduled and there was extensive evidence presented that demonstrated Defendant Bradley's knowledge that these substances were controlled.

Defendant Bradley argues that the Government referred to this false testimony in its closing remarks. But any potential error here would likewise not require reversal because the "remarks made by a prosecutor in his closing argument must not only have been improper, but must have also 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Ellis*, 121 F.3d 908, 928 (4th Cir. 1997) (citation omitted). "In considering whether such remarks prejudiced the defendant, we consider the following: (1) whether the prosecutor's remarks had a tendency to mislead the jury and prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the weight of the evidence against the accused; and (4) whether the prosecutor's remarks were deliberate." *Id.*

Defendant has not established that the prosecutor's remarks were false.  Even if they were, they appear isolated.   And most importantly, much of the evidence summarized above also established Defendant Bradley's knowledge, and so even "absent the remarks, the weight of the evidence [is] against the accused."  *Id.*

Accordingly, the Court denied Defendants' motions on these grounds.

### E.  Prosecutor's Rebuttal Argument

Defendants argue that the Government's rebuttal argument "improperly misstated the law and asked the jury to wholesale ignore the arguments raised by the Defendant," and thereby fundamentally infected the entire trial.  (Dkt. 527 at 4).  But Defendants did not object to this during the argument, and the Fourth Circuit has "long held that the failure to object to a prosecutor's statements made during closing arguments constitutes a waiver of that claim of error."  *United States v. Cone*, 714 F.3d 197, 217 (4th Cir. 2013).  There is an exception to this general rule "if exceptional circumstances exist such as when the error is so obvious or so serious that the public reputation and integrity of the judicial proceeding is impaired."  *Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 367 (4th Cir. 1985).  Here, Defendants do not identify which statements they take issue with, and they do not explain how the trial's integrity was impaired.  Nevertheless, I have reviewed the transcript of the rebuttal argument and have seen no evidence of this sort of prejudicial statement.  The Court denied Defendants' motions on this ground.

### F.  Jury Instruction Numbers 10 and 38

Defendants argued that the Court erred in denying Defendants' proposed jury instructions.[17]  "A district court commits reversible error in refusing to provide a proffered jury

---

[17]     Although Bradley purported to renew all objections to the jury instructions that were previously made, he only specifically addressed two objections.  Only those two objections are addressed in this opinion, but the Court stands by its previous rulings on jury instructions.

instruction only when the instruction '(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'" *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (citation omitted).  Jury instruction number ten told the jury "[t]he fact that an alleged accomplice has pled guilty to the offense charged is not evidence of guilt of any other person . . . ."  (Dkt. 495 at 11).  Bradley requested the following addition to that jury instruction:

> The guilty pleas and admissions of alleged accomplices cannot be considered by you as evidence that an unlawful conspiracy existed or that the Defendant were members of an unlawful conspiracy.  Indeed, the fact that Jason Bradley's wife has pled guilty to count one of the superseding indictment cannot be considered by you as evidence of his guilt.

(Dkt. 486 at 1).   The requested addition was unnecessary because Defendant's requested instruction was substantially covered by the existing paragraph.

Likewise, the second paragraph of jury instruction thirty-eight stated that the defendant must know "that the substance with which he or she was dealing was some controlled substance—that is, treated as such by operation of the Analogue Act . . . ."  (Dkt. 495 at 39).  The third paragraph continued: "A defendant need not know the chemical structure of a substance or its effects on a human being in order for you to find that the defendant knew the substance was controlled under federal law."   (*Id.*).   Bradley requested that the third paragraph of jury instruction number thirty-eight be struck and replaced with the following:

> The government must prove beyond a reasonable doubt that a defendant knew that the substance was controlled under the federal Analogue Act, as opposed to under any other federal (i.e. customs) or state laws.  In essence, the government must show that the defendant knew the substance was outlawed or illegal under the federal controlled substances law.

(Dkt. 486 at 3).  The existing charge covered Bradley's proposed instruction and *McFadden*'s requirements; Defendant Bradley was not entitled to his own formulation of that principle of law. The jury was properly instructed, and so Defendants' motion was rejected.

## V.    AS-APPLIED CHALLENGE TO ANALOGUE ACT

Defendants also brought an as-applied "void-for-vagueness" challenge to the "substantially similar" language in 21 U.S.C. § 802(32)(A).  A "void-for-vagueness" challenge arises under the Due Process Clause when a criminal statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).  Defendant Deborah Ryba raised this argument before trial, and her co-defendants joined her motion.  The Court took the motion under advisement because the result depended on what evidence was presented at trial.  *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.").  After evaluating the evidence presented at trial, the Court holds that the as-applied challenge fails.

First, the evidence presented at trial disposed of any vagueness concerns.  *Klecker* found it useful to compare chemical diagrams of the controlled substance and the alleged analogue. *United States v. Klecker*, 348 F.3d 69, 71–72 (4th Cir. 2003), *overruled on other grounds by McFadden*, 135 S. Ct. 2298 (2015).  The Fourth Circuit's first *McFadden* opinion took the same approach—and even looked at two chemical diagrams (showing methcathinone and MDPV) that were presented in this trial.   753 F.3d at 439–40 (4th Cir. 2014) ("The testimony of Dr. DiBerardino comprehensively addressed the chemical diagrams comparing the chemical structures of 4–MEC and MDPV with methcathinone, and methylone with ecstasy. Presenting

two-dimensional diagrams in which the chemical structures of 4–MEC and MDPV were displayed in an overlapping manner with the chemical structure of methcathinone, Dr. DiBerardino explained that these substances share a core chemical structure . . . ."), *vacated and remanded on other grounds*, 135 S. Ct. 2298 (2015).  Here, Dr. Van Linn testified and presented diagrams comparing the analogues and the controlled substances.  (Dkt. 561 at 23-32; dkt. 508-60 at 9; dkt. 508-60 at 23).  Specifically, he demonstrated that MDPV was substantially similar to methcathinone, and then demonstrated that a-PVP was substantially similar to MDPV.  Likewise, Dr. Prioleau testified that the analogues have similar effects on the central nervous system as the controlled substances.  Based on this testimony and demonstration, the similarities between methcathinone, MDPV, and a-PVP were sufficient to "put a reasonable person on notice" that MDPV was an analogue of methcathinone and that a-PVP was an analogue of MDPV.  *McFadden*, 753 F.3d at 439, *vacated and remanded on other grounds*, 135 S. Ct. 2298 (2015).  The Analogue Act was not unconstitutionally vague as applied to Defendants.[18]

Second, these challenges have long been rejected in the Fourth Circuit and elsewhere.  *See Klecker*, 348 F.3d at 72 ("Notwithstanding this indeterminacy in § 802(32)(A), other courts of appeals have unanimously rejected vagueness challenges to Analogue Act prosecutions."); *United States v. Turcotte*, 405 F.3d 515, 531 (7th Cir.2005) ("The circuit courts considering this issue have unanimously held that the CSA's Analogue Provision is not unconstitutionally vague.").  These cases do not end the inquiry here because an as-applied challenge is evaluated

---

[18]    Defendants respond by pointing out that Dr. Van Linn acknowledges that there is no scientific consensus on whether these drugs are "substantially similar."  But this argument misses its target: Substantial similarity is not a technical term that requires scientific consensus.  Instead it utilizes normal understanding of common words and requires a fact finder determination.  *See United States v. Washam*, 312 F.3d 926, 931 (8th Cir. 2002) ("Rather than unanimous expert ratification, we look to whether the statute gave adequate warning, under a specific set of facts, that the defendant's behavior was a criminal offense.").

based on "the facts of the case at hand." *Maynard*, 486 U.S. at 361.  Still, these cases have analyzed comparisons of the same controlled substances and analogues and so provide support to the above conclusion of the statute's constitutionality.  *See McFadden*, 753 F.3d at 440 (affirming district court that held MDPV and methcathinone were substantially similar and rejecting as-applied challenge), *vacated and remanded on other grounds*, 135 S. Ct. 2298 (2015).

Third, this consensus has only been strengthened by *McFadden*'s elevation of the required *mens rea* for convictions under federal controlled substance law.  *See United States v. Makkar*, 810 F.3d 1139, 1142 (10th Cir. 2015) (Gorsuch, J.) ("[T]he Court only recently gave the Analogue Act a narrow construction that may go some way to alleviating potential concerns about the vagueness of its terms."); *see also United States v. Carlson*, 810 F.3d 544, 550–51 (8th Cir. 2016) ("The Supreme Court recently determined in *McFadden v. United States* that the Analogue Act is not unconstitutionally vague because the statute's 'knowingly or intentionally' scienter requirement alleviates vagueness concerns by 'narrow[ing] the scope of its prohibition, and limit[ing] prosecutorial discretion.' [quoting *McFadden*].  Carlson's constitutional challenge thus fails.").  Defendants here possessed the requisite heightened *mens rea*, concerns about an overbroad prohibition or expansive prosecutorial discretion are not readily challenged by these Defendants.  Defendants' as-applied challenge fails.[19]

## VII. MOTION FOR AUDIO RECORDING

There remains one last loose thread to tie off.  Bradley filed a motion for access to the court reporter's personal audio recording of the trial, or in the alternative for preservation of that

---

[19]    Even if the Defendants succeeded on an as-applied challenge, their convictions would still be valid because the jury found that they had conspired to traffic both controlled substance analogues and controlled substances themselves.  Any error on this point would be harmless because "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967).

audio with the record on appeal. (Dkt. 526). Some context is necessary. During trial, a number of witnesses from Hong Kong testified as to the chain of custody of certain exhibits. Because these witnesses spoke limited or no English, a certified Cantonese interpreter was employed by the Government. Defense counsel told the Court that Bradley believed, based on his limited understanding of Cantonese, that part of the translation was incorrect, but Bradley and his counsel were unable to state what specific error the translator made. The Court addressed Bradley's concerns with the translator, and defense counsel dropped the matter. Only later, after the translator left and the witnesses had returned to Hong Kong, defense counsel filed a motion asking for the audio. The Court denied that motion. (Dkt. 493). Bradley did not introduce new arguments, and so the Court reaffirmed that ruling.

This leaves the question of preserving the audio recording with the record. Granting this motion would still require the court reporter to turn over her personal property, and so the Court's previous analysis remain relevant here. Courts are required to employ court reporters who record all court proceedings "verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference." 28 U.S.C. § 753. When a court reporter files a transcribed record of a proceeding, that record is deemed a judicial record, while any back up recording is the court reporter's personal property. *See United States v. Davis*, 648 F. App'x 295, 297 (4th Cir. 2016) ("[A]udiotapes that merely back up the court reporter's stenographic record are the personal property of the reporter and are not judicial records, unless some reason is shown to distrust the accuracy of the stenographic transcript." (internal quotation marks omitted)); *Smith v. U.S. Dist. Court Officers*, 203 F.3d 440, 442 (7th Cir. 2000). When Bradley raised this concern during trial, the Court questioned the interpreter directly, and the interpreter assured the Court—and all counsel—that he was

31

translating the testimony of the witnesses in court, not reading previous statements.  Based on that colloquy and Bradley's failure to locate any specific error in the translation, the Court finds that there is no reason to doubt the accuracy of the translation.  Accordingly, the Court will not now order the court reporter to turn over these personal recordings.  *See In re Pratt*, 511 F.3d 483, 485 (5th Cir. 2007) (a party "may only obtain a court reporter's backup tapes if there is reason to doubt the accuracy of the stenographic transcript.").  Furthermore, following the interpreter's explanations, no additional objections were raised that day.  "The lack of objection during trial weighs heavily against granting relief . . . ."  *United States v. Mata*, 181 F.3d 93, 93 (4th Cir. 1999).  Defendant's motion is denied.

## VI. CONCLUSION

The Government presented ample evidence that Defendants committed serious drug and money-laundering offenses before the jury convicted these three Defendants.  Defendants have not demonstrated that the Court, the Government, or the jury made an error that would require the Court to acquit the Defendants or order a new trial.  Accordingly, the Court denied these motions orally at the post-trial hearing.

An appropriate Order summarizing the Court's previous oral orders at the hearing will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to the Government, Defendants, and all counsel of record.

Entered this 21st day of December, 2017.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE